**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Bennett and Jacquelynn Dorrance, | No. CV-09-1284-PHX-GMS |
| Plaintiffs, | **ORDER** |
| v. | |
| United States of America, | |
| Defendant. | |

Pending before the Court are cross-motions for summary judgment. (Docs. 64, 67). For the reasons stated below, both motions are denied.[1]

## BACKGROUND

In 1995, Plaintiffs formed the Dorrance 1995 Legacy Trust (the "Trust"), which in turn purchased five life insurance policies in 1996. (Doc. 67-1 ¶¶ 16, 17). The policies were purchased with The Prudential Insurance Company of America ("Prudential"), Sun Life Assurance Company of Canada ("SunLife"), Phoenix Home Life Mutual Insurance Company ("Phoenix"), Principal Life Insurance Company ("Principal"), and Metropolitan Life Insurance Company ("MetLife"). (Doc. 65 ¶ 1). In the aggregate, the policies provided $87,775,000.00 in coverage. (Doc. 67-1 ¶¶ 19–23). The Trust

---

[1] Both parties have requested oral argument. The requests are denied because the parties have had an adequate opportunity to discuss the law and evidence and oral argument will not aid the Court's decision. *See Lake at Las Vegas Investors Group, Inc. v. Pac. Malibu Dev.*, 933 F.2d 724, 729 (9th Cir. 1991).

purchased the policies in the anticipation that the benefits would provide liquidity to pay Plaintiffs' estate taxes upon their death, so that Plaintiffs' heirs would not need to liquidate the family stock portfolio to pay such taxes. (Doc. 67-1 ¶ 17).

All of the policies were purchased with mutual insurance companies. In a mutual insurance company, the policyholders have an interest in the company itself in addition to holding a policy. This interest provides the policyholder with certain rights, including the right to vote on corporate decisions and the right to receive the mutual company's surplus should the company liquidate. (Doc. 65 ¶ 7; Doc. 67-1 ¶ 6).[2] Plaintiffs describe these rights as "ownership" rights, while Defendant describes them as "membership" rights. (Doc. 64 at 2; Doc. 67 at 2). At this stage in the litigation, the Court will refer to these rights as "mutual rights."[3] Policyholders cannot sell the mutual rights separately from their underlying policies. (Doc. 65 ¶ 9). If a life insurance policy held with a mutual insurance company is terminated, the mutual rights are extinguished as well. (Doc. 65 ¶ 10).

The five mutual life insurance companies demutualized through processes that began in 1998, 1999, and 2000, and culminated in 2000 or 2001. (Doc. 65 ¶¶ 32–38). In the process of demutualization, a mutual company changes its corporate structure into that of a stock company, often through a procedure governed by state statute. (Doc. 67-1 ¶ 39; Doc. 65 ¶ 24). Policyholders must vote to approve a demutualization before the

---

[2] The parties dispute the degree to which the mutual rights provided dividends. Insurance policyholders receive dividends, and as the mutual insurance companies demutualized, the companies set aside funds to ensure that these dividends continued. Plaintiffs do not deny that they continued to receive dividends after demutualization, and Defendant does not deny that the dividends come from money set aside into blocks from the companies' surplus, which in some circumstances (such as liquidation) is associated with the mutual right. (Doc 65 ¶ 23; Doc. 79-1 ¶ 23).

[3] The Court notes that another district court, considering whether a policyholder was deprived of property when a mutual company demutualized and did not provide the policyholders any compensation for these rights, found that policyholders' interest in a mutual life insurance company "did not rise to the level of a property interest such as to render policy holders 'owners' of the corporation." *Tancredi v. Metropolitan Life Ins. Co.*, 149 F. Supp. 2d 80, 86–87 (S.D.N.Y. 2001). The decision is not binding on this Court.

1  process can proceed. (Doc. 67-1 ¶ 40).[4] Prior to seeking policyholder approval, at least

2  one of the companies promised policyholders that if they voted for demutualization,

3  premiums would not increase, and in fact none of the premiums Plaintiffs paid increased

4  after demutualization. (Doc. 65 ¶ 39; Doc. 79-1 ¶ 39).

5          When the companies demutualized, policyholders (including Plaintiffs) therefore

6  retained their policies and continued to pay the same premiums. They no longer,

7  however, held mutual rights, and therefore could not vote on corporate decisions and had

8  no interest in the surpluses of the new companies. (Doc. 65 ¶ 18). In exchange for the lost

9  mutual rights, the companies provided policyholders with the option of receiving stock in

10  the new companies or receiving a cash payment in lieu of stock. (Doc. 67-1 ¶ 55). When

11  determining how much stock to give policyholders, the companies calculated a "fixed"

12  component to correspond to policyholders' loss of voting rights, and a "variable"

13  component designed to measure "the policyholders' contribution to the surplus of the

14  company." (Doc. 67-1 ¶ 55). Although the companies used slightly different methods to

15  measure their policyholders' contribution to the company's surplus, all obtained

16  independent actuarial opinions that the methods were "fair and equitable." (Doc. 67-1 ¶

17  56). The stock the Trust received during the demutualizations had a total value of

18  $1,794,771.00. (Doc. 67-1 ¶¶ 60–65). The Trust sold all the stock on June 23, 2003, for

19  an aggregate price of $2,248,806.00. (Doc. 67-1 ¶ 65).

20          When the Trust received its IRS Form 1099-B, the form listed the basis in the

21  Trust's stock as zero, consistent with IRS policy that policyholders have no basis in stock

22  received by a policyholder during demutualization of a life insurance company. (Doc. 67-

23  1 ¶ 66). Plaintiffs paid the taxes thereby owed, and subsequently filed this claim for

24  relief.

25

26          [4] For example, Arizona, state regulations require that demutualization plans be
approved by the state Director of Insurance, permit companies to limit the right to vote on
demutualization to policyholders whose policies are worth over $1,000 and have been
27  held more than a year, and provide that policyholders receive equity through "a fair
formula approved by the director" that reflects the insurance company's entire surplus.
28  A.R.S. § 20-730.

1    Defendant has filed a motion for summary judgment, arguing that no part of
2    Plaintiffs' periodic payments for their original insurance policies was paid to acquire the
3    mutual rights under the policy, and that all of the premium was paid to purchase the
4    policy. As a result, under this theory, Plaintiffs would have had no basis in the stock that
5    was provided in exchange for those rights. (Doc. 64).

6    Plaintiffs likewise have filed a motion for summary judgment, arguing that the
7    demutualization should be governed by the open transaction doctrine, which is employed
8    in circumstances where the basis in property that is split cannot be allocated to the
9    resulting assets. Under this theory, all of the proceeds from Plaintiffs' sale of stock would
10   be considered return of capital from their premiums, and they would thereby owe no tax.
11   (Doc. 67).

**DISCUSSION**

12   **I.    Legal Standard**

13
14   Summary judgment is appropriate if the evidence, viewed in the light most
15   favorable to the nonmoving party, shows "that there is no genuine issue as to any material
16   fact and that the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c).
17   Only disputes over facts that might affect the outcome of the suit will preclude the entry
18   of summary judgment, and the disputed evidence must be "such that a reasonable jury
19   could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477
20   U.S. 242, 248 (1986). "[A] party seeking summary judgment always bears the initial
21   responsibility of informing the district court of the basis for its motion, and identifying
22   those portions of [the record] which it believes demonstrate the absence of a genuine
23   issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

24   **II.   Analysis**

25   Defendant claims that Plaintiff has not met its burden of establishing that it paid
26   anything for the mutual rights at all. (Doc. 64). Plaintiffs have alleged that the rarely-used
27   open transaction doctrine governs this case. (Doc. 67). In 2008, the United States Court
28   of Federal Claims ruled (in a decision after a bench trial) that demutualization of a mutual

insurance company is one of the "rare and extraordinary" circumstances in which the open transaction doctrine should apply. *Fisher v. United States*, 82 Fed. Cl. 780, 795 (Fed. Cl. 2008) (aff'd without opinion by *Fisher v. United States*, 333 Fed. App'x. 572 (2009)). Both arguments will be considered before the Court discusses the regulatory framework regarding allocating basis in divided property.

### A.    The Burden of Proving Basis in Property

Under the Internal Revenue Code, gross income includes "[g]ains derived from dealings in property." 26 U.S.C. § 61(a)(3) (2006). The gains derived from property are defined as "the excess of the amount realized therefrom over the adjusted basis." 26 U.S.C. § 1001(a). The basis of property is defined by regulation as "the cost of such property." 26 U.S.C. § 1012(a). The burden of establishing a basis in property "rest[s] on the taxpayer." *Coloman v. C.I.R.*, 540 F.2d 427, 429 (9th Cir. 1976).

When a taxpayer offers only an "unverified statement that he had contributed property . . . to the partnership," he has not met his burden of showing he invested in the underlying asset. *Coloman*, 540 F.2d at 427. On the other hand, when a taxpayer has shown that he made some investment into property, but cannot establish the value of that investment, his basis should not be declared zero "on the ground that it [is] impossible to tell how much he had in fact spent." *Cohan v. Comm'r of Internal Revenue*, 39 F.2d 540, 543 (2d Cir. 1930) (Hand, L., J.). In such cases, the government "should make as close an approximation as it can" to the actual basis, "bearing heavily if it chooses upon the taxpayer whose inexactitude is of his own making." *Id.* at 544. More recent decisions of the Ninth Circuit have continued to rely on *Cohan*, noting that if "it is clear that the taxpayer is entitled to some deduction, but he cannot establish the full amount claimed, it is improper to deny the deduction in its entirety." *United States v. Marabelles*, 724 F.2d 1374, 1383 (9th Cir. 1984).

Plaintiffs have met their burden of showing they paid something for the mutual rights by proving that they paid premiums for policies that included the policy rights and the mutual rights. Defendant's motion for summary judgment is therefore denied. The

question at issue is how that basis ought to be allocated between the two assets that were created when the companies de-mutualized.

**B.     The Open Transaction Doctrine**

**1.     Background**

The open transaction doctrine allows a taxpayer to apply gains received from the sale of a portion of a piece of property to the entire original basis without apportioning the basis between the property that was sold and the property that was retained; the doctrine is available only in "rare and exceptional" circumstances. *Fisher*, 82 Fed. Cl. at 795. The doctrine was announced by the Supreme Court in *Burnet v. Logan*, 283 U.S. 404 (1931), and although subsequent regulations have narrowed its scope, *Logan* remains the core authority for the open transactions doctrine. *See, e.g.*, *Ebert v. United States*, 66 Fed. Cl. 287, 292 (Fed. Cl. 2005) ("[*Logan*] addressed the question of whether a transaction whose value was contingent on future events could, in effect, be treated as a closed transaction."); *Inaja Land Co., Ltd. v. C.I.R.*, 9 T.C. 727 (1947) (citing *Logan* when holding that "no portion of the payment in question should be considered as income, but the full amount must be treated as a return of capital and applied in reduction of petitioner's cost basis").

The taxpayer in *Logan* owned a share of an iron company which in turn owned 12% of an ore company. *Logan*, 283 U.S. at 409. The ore company apportioned the value of the ore it extracted to its shareholders, including the iron company in which the taxpayer held an interest. *Id.* In 1916, the iron company was sold to Youngstown Sheet and Tube Company; Youngstown paid the shareholders $2,200,000 in cash and agreed to pay 60 cents for every ton of ore extracted by the ore company. *Id.* Thus, the taxpayer received, in exchange for the shares she owned, both a lump sum and an income stream that depended on the continued success of the ore company. The Commissioner originally discounted the income stream to an estimated present value, and then apportioned the taxpayer's original basis in the fixed portion of the asset and the income stream according to the same ratio that they had to each other at the time of distribution.

*Id.* at 411. The Supreme Court ruled that the taxpayer had not received two assets in exchange for her stock; instead she had received cash and "the promise of future money payments wholly contingent upon facts and circumstances not possible to foretell with anything like fair certainty." *Id.* at 413. It held that the value of the income stream could not be estimated, because it "had no ascertainable fair market value." *Id.* It therefore allowed the taxpayer to apply the entire basis of the original stock purchase to the cash portion of the transaction; as a result she realized no gain at the time, but would only do so were the ore payments to exceed her remaining capital investment. *Id.*

At its core, the *Logan* Court held that the basis in the stock could not be allocated between the income stream and the cash payment because the value of the income stream was too uncertain. *Id.* at 413. Had the Court accepted the Commissioner's allocation and the ore company subsequently seen better-than-expected production, or had it sputtered, the original basis allocation would have been incorrect. The Court did not address whether the relative cost of the income stream and the cash portion of the stock could have been determined when the stock was originally purchased; its focus was solely on the value of the separate portions of the asset at the time they were split. *Id.*

The open transaction doctrine has periodically been invoked by both the Government and taxpayers. The Government successfully urged application of the doctrine in *Pierce v. United States*, 49 F. Supp. 324 (Ct. Cl. 1943). There, a bank had created a security company in which its shareholders were given an interest based on their interest in the original company, without paying anything mord. After a federal law mandated dissolution of the security company, a taxpayer claimed that his original basis in the stock should be allocated between his remaining bank stock and the dissolution proceeds, which he claimed represented a loss. *Id.* at 329–30. The Court found that apportionment was inappropriate because "the exact answer to the question of profit or loss may be obtained by waiting till the bank stock is sold." *Id.* at 330.

A taxpayer successfully invoked the doctrine in *Inaja Land Co., Ltd. v. C.I.R.*, 9 T.C. 727 (Tax. Ct. 1947). There, a company purchased land by the Owens River, near

Los Angeles, for $61,000 to start a fishing club and to rent some of the property for livestock grazing. The City of Los Angeles, acting without "any right to divert, release, or suffer the release of waters into the Owens River in such a manner that such waters would flow through or over petitioner's lands," constructed massive concrete tunnels upstream from the landowner and dumped the resultant pollutants into the river, "which injured and killed fish and interfered with the fishing on petitioner's lands." *Id.* at 730. The landowner sued, and received a $50,000 settlement in exchange for releasing any claim relating to discharging foreign water from the tunnels into the Owens River. *Id.* The question for the court was what portion of the initial purchase price could be allocated as a basis against which to apply the settlement money. The court read the settlement as the purchase of an easement over the company's land, but agreed with the landowner that "it would be impracticable and impossible to apportion a definite basis to the easements here involved, since they could not be described by metes and bounds; that the flow of the water has changed and *will change* the course of the river; that the extent of the flood was not and *is not predictable*; and that to this date the city *has not released the full measure of water to which it is entitled.*" *Id.* at 736 (emphasis added).

In all of these cases, the basis a taxpayer had in the original asset could not be allocated when the asset was split because the value of the asset that the taxholder kept was "impossible to determine with fair certainty." *Logan*, 283 U.S. at 412. Because of this uncertainty, it was not clear whether the taxpayer had, or would eventually experience, a gain or a loss on the transaction as a whole, and it was determined that a taxpayer should not "be charged with gain on pure conjecture unsupported by any foundation in ascertainable fact." *Inaja Land*, 9 T.C. at 736. Regulations have replaced at least part of the open transactions doctrine, in particular with regards to contingent payments; there are now regulations allocating basis in any transaction that "provides for one or more payments due more than 1 year after the date of the sale or exchange." 26 C.F.R. § 1.483-1(a)(1).

In 2008, the Court of Federal Claims applied the open transaction doctrine in a

case where a taxpayer had received a cash payment in exchange for his mutual rights during the demutalization of a life insurance company. *Fisher v. United States*, 82 Fed. Cl. 780, 795 (Fed. Cl. 2008). After taking what it described as a "*tour d'horizon*" of the relevant caselaw, statutes, and regulations, the *Fisher* court noted that the open transaction doctrine remained "a viable, albeit limited, exception to the general rule enunciated" by 26 C.F.R. § 1.61-6(a). *Fisher*, 82 Fed. Cl. at 791. Writing after a trial in which the Government had argued that the mutual rights were worth nothing while the taxpayer had asserted that valuing the rights was impossible, the Court sided with the taxpayer, noting that "the ownership rights were, at the outset, inextricably tied to the underlying insurance policy and were not separately sellable." *Id.* at 795. It thus applied the open transaction doctrine, allowing the taxpayer to treat all of the premium payments he had made during the course of the policy as capital investment, and deferring any payment on the proceeds that the taxpayer had received in exchange for his rights. *Id.* at 799. The Federal Circuit affirmed without opinion. *Fisher v. United States*, 333 Fed. Appx. 572 (2009).

Other courts have not yet had the opportunity to consider whether application of the open transactions doctrine was appropriate in *Fisher. See, e.g.*, *Cadrecha v. United States*, ___ Fed. Cl. ___, 2012 WL 1095359 (Fed. Cl. Apr. 2, 2012) (declining to apply *Fisher* when the taxpayer's claim was untimely). Practitioners, however, quickly noted significant factual distinctions between historical open transaction cases and those involving demutualization of life insurance companies. In particular, one noted, "the assets usually involved in the open transaction doctrine will eventually be disposed of; conversely, life insurance policies are generally held until the death of the insured, at which time the basis is no longer needed." Stephen J. Olsen, *Chuck v. Goliath: Basis of Stock Received in Demutualization of Mutual Insurance Companies*, 9 Hous. Bus. & Tax L.J. 360, 382–83 (2009). As a result, when a taxpayer is allowed to use the open transaction doctrine in the context of stock received during demutualization, he "is getting a windfall, because all of the basis may be allocated to the assets that will be sold,

while the asset that does not require basis has had its basis reduced." *Id.*; *see* 26 U.S.C. § 101(a)(1) (excluding payment under a life insurance contract from gross income), 26 U.S.C. § 72(e)(6) (defining the basis in a life insurance contract that has been surrendered for cash as the aggregate of premiums paid less the amount received under the contract).

Another commenter pointed out that the arguments advanced by the parties in *Fisher* may have made it appear more difficult to allocate basis under the regulations than it actually was. The government had only put forward expert witnesses stating that the taxpayer had paid nothing for the rights, while the taxpayer had put forward only experts claiming that calculating the cost of the rights was impossible—neither party addressed "how use of the doctrine could be avoided altogether by applying reasonable alternative basis apportionment methods." Paul Galindo, *Revisiting the "Open Transaction" Doctrine: Exploring Gain Potential and the Importance of Categorizing Amounts Realized*, 63 Tax Lawyer 221, 234 (2009). Noting that the value of the stock and the value of the policy on the secondary market were both ascertainable at the time of demutualization, and a ratio from which to apportion basis could be calculated, the commenter wrote that apportionment "through the use of current and readily ascertainable relative fair market value data seems reasonable." *Id.* at 244.

## 2.    Application

Plaintiffs have failed to show that allocating basis between the mutual rights and the stock is so difficult that this case requires applying the open transactions doctrine. Despite disagreement as to what Plaintiffs may have paid for their mutual rights, there is no question that at the time of demutualization, both the value of the stock and the market value of the policy itself could be calculated. The open transactions doctrine prevents the government from forcing a taxpayer to apportion basis in transactions where only through waiting can "the exact answer to the question of profit or loss" be found. *Pierce*, 49 F. Supp. at 330. In *Inaja Land*, the rights ceded to Los Angeles were so uncertain that there remained a genuine question as to whether the land retained any value at all, because, depending on how much the city continued to pollute the river, the easement may have

rendered the land worthless, and the company may have in fact sold its investment at a loss. *Inaja Land*, 9 T.C. at 736.

Since the value of both the mutual rights and the policy itself at the time of demutualization can be determined, there is no concern here that the taxpayer will be forced to pay tax on a transaction that is later proven to show a loss. The Ninth Circuit has confirmed that "taxation of an 'open' transaction is deferred only to the extent that *consideration received by the seller* consists of property having no ascertainable fair market value *in the year of sale*." *In re Steen*, 509 F.2d 1398, 1404–05 (9th Cir. 1975) (emphasis added). Here, Plaintiffs received stock, and retained a marketable life insurance policy; it is practical and possible in such circumstances to ascertain the value of these assets in the year of the sale.

The Court does not lightly disagree with another federal district court, and relies in some degree on arguments that do not appear to have been made before the *Fisher* court. But given the limited arguments at trial, it is not surprising that the *Fisher* court found that it was limited to deciding only whether "***none*** of the basis of the originally-acquired property is allocable to the part disposed of or that ***all*** of it is allocable thereto until exhausted?" *Id.* at 784 (double emphasis in original). At summary judgment, this Court is not so limited, and finds neither argument convincing. *See Celotex*, 477 U.S. at 323–24 (noting that a purpose of summary judgment is "to isolate and dispose of factually unsupported claims" before trial).

The facts particular to this case show that applying the open transaction doctrine would be inequitable here. In *Fisher*, the plaintiff opted for the "cash election" upon demutualization, and thereby received an immediate payment in exchange for his mutual rights. *Fisher*, 82 Fed. Cl. at 783. Here, Plaintiffs received stock, held it for years, and sold it for $454,035 more than its market value at the time of demutualization. (Doc. 67-1 ¶ 65). The open transactions doctrine would therefore allow Plaintiffs to apply this gain to basis accrued through policy payments made before mutualization, even though the increase in value took place entirely after the rights were split. At the same time, since the

open transaction doctrine would not recognize any separate bases in the policy and the stock, policy payments made after the companies demutualized would increase the total basis towards which the stock sale would be applied, even though these payments were not made to obtain the mutual rights or the stock.

The First Circuit conducted a sophisticated analysis of the treatment of distributions after a demutualization from the perspective of the insurer in *UNUM Corp. v. United States*, 130 F.3d 501 (1st Cir. 1997). There, the insurance company claimed that the distributions to policyholders should be interpreted as a "policyholder dividend," and therefore should be deductible for the insurance company. *Id.* at 517; *see* 26 U.S.C. § 808(a). The court found that although UNUM had made a colorable argument based on the language of the statute, the court had an obligation to consider the statutory language in the context of the "basic policies and structure of the Code," and that "when the language is read against the background of the statutory structure, it becomes untenable." *UNUM*, 130 F.3d at 517 (quoting *Colonial American Life Ins. Co. v. C.I.R.*, 491 U.S. 244, 257 (1989)). So here, while the difficulty in pricing the mutual rights at the time the policies were purchased bears some surface resemblance to similar difficulties in open transaction cases, applying a doctrine that would permit Plaintiffs to realize untaxed gain of nearly a half a million dollars that post-dated demutualization, and to avoid taxation entirely should they hold their insurance policy until their death, does not comport with the background and basic policies of the tax code. *Colonial American*, 491 U.S. at 257.

This Court need not opine on the continued viability of the open transaction doctrine, or speculate on what circumstances may trigger its application. Given the undisputed facts of this case, it need only note that the doctrine does not apply here. Summary judgment is denied to Plaintiffs.

## C. Calculating Basis in Divided Property

When a taxpayer sells only one part of a piece of property, the entire cost of the property "shall be equitably apportioned among the several parts." 26 C.F.R. § 1.61-6(a). There is no single accepted method for apportioning basis equitably. The Ninth Circuit

has suggested that one method for apportioning the basis to a certain property right that a taxpayer had sold while maintaining other rights would be to compare the price of the property, at the time it was originally purchased, to the market prices of similar properties without the right in question. *Gladden v. C.I.R.*, 262 F.3d 851, 856 (9th Cir. 2001) (returning the case to the district court and suggesting that "it may be possible to determine the premium price paid for the potential water rights by comparing the price of the land purchased by the partnership to prices of similar land without" such potential rights). Other circuits have suggested that basis can be equitably apportioned by comparing the fair market value of the two pieces of property at the time of division, and applying that ratio to the original cost. *See Byram v. C.I.R.*, 555 F.2d 1234, 1236 (5th Cir. 1977) ("What appellants should have shown, and never did, was the fair market value of the tract."); s*ee also Urbanek v. United States*, 731 F.2d 870, 873 (Fed. Cir. 1984) (holding that allocating basis "in proportion to fair market value of the interests sold and retained" is "in accord with correct accounting practice").

Defendant argues that Plaintiffs did not pay a "premium" for the mutual rights by noting that Plaintiffs did not pay higher premiums after demutualization and that the mutual companies did not consider the mutual rights when calculating the prices of the policies. As noted above, at least one of the companies promised the policyholders that premiums would not rise under demutualization, perhaps to secure the votes of its policyholders. The comparison between the price of the policies pre- and post-mutualization would therefore not necessarily capture any actual premium paid by Plaintiffs for their policies relative to other polices available without mutual rights when Plaintiffs first acquired their polices.

In *Gladden*, the taxpayer had purchased a piece of property in which rights were anticipated but had not vested; the question for the court was how to assign basis to the potential rights when the land was purchased. 262 F.3d at 854. The Ninth Circuit suggested that the district court may calculate the premium paid for such rights by comparing the price of land with such potential rights to the price of comparable land

1  without such expectations. *Id.* at 856. Under this method, the proper comparison here

2  would be between the periodic premiums that Plaintiffs paid in order to purchase and

3  retain their policies and the premiums that would have been required for equivalent

4  polices offered over the same period that did not offer mutual rights.

5      True, the *Gladden* court was dealing with land that had the potential to gain rights,

6  not land on which rights already existed. It did find, however, that the regulation on

7  allocating property by its value "would be easy to apply . . . if the water rights had

8  already been vested when the partnership had purchased the land." *Id.* at 853.[5] Nothing in

9  the opinion suggests that comparing the price of comparable purchases with and without

10 such rights would inappropriate when the rights were actual rather than potential. *Id.*

11     Such a comparison is not possible from the current record. Defendant has only

12 compared the cost of Plaintiff's policy before and after demutualization; it has not

13 provided any evidence comparing the cost of Plaintiff's policy at the time it was

14 purchased to similar policies lacking mutual rights. *See* Douglas P. Faucette & Timothy

15 S. Farber, *National Insurance Act of 2007 & Demutualization of Insurers: The Devil is in*

16 *the Details*, FDCC Quarterly 109, 123 n.44 ("[A] sophisticated policyholder might have

17 been willing to pay more for his policy, after incorporating the small probability that his

18 mutual would liquidate or convert, and thereby owe him a portion of its otherwise-

19 withheld surplus."). Moreover, parties have not had the opportunity to argue that using

20 the method suggested by *Gladden* would be more equitable than comparing the value of

21 the rights and the policy at the time of demutualization.

22     Neither party has yet presented evidence from which the Court could equitably

23 apportion the premiums paid before demutualization as basis in the mutual rights and

24 basis in the policies themselves. The Court has noted that previous Ninth Circuit caselaw

25

26     [5] The *Gladden* court noted that in this "easy case" the facts would have resembled
   *Inaja Land*, and Plaintiffs urge the court to therefore apply the open transactions doctrine.
27 The *Gladden* court did not suggest that in cases where the rights had vested the open
   transaction doctrine always applied, and neither *Gladden* nor this case present the
28 uncertainty regarding present value that governed *Inaja Land*.

- 14 -

suggests that the best method for such apportionment would be to compare the cost of Plaintiffs' policies to the cost of comparable policies issued by non-mutual insurance companies at the time of issuance. *Gladden*, 262 F.3d at 856. On the other hand, commenters writing specifically about the issue of applying basis to mutual rights have suggested that comparing the market value of the policy and the stock at the time of demutualization, and applying that ratio to the premium payments, would be more appropriate.

The Court need not address, at summary judgment, which method of apportionment is appropriate. Plaintiffs have shown that they may have paid something for the mutual rights. The open transactions doctrine does not apply because the facts here do not present "elements of value so speculative in character as to prohibit any reasonably based projection of worth." *Campbell v. United States*, 661 F.2d 209, 215 (Ct. Cl. 1981), The regulation requires basis to be apportioned equitably. 26 C.F.R. § 1.61-6(a). The Court reminds the parties that, as in *Fisher*, the trial will be to the bench. *See Galloway v. United States*, 319 U.S. 372, 388 (1943) (holding that the Seventh Amendment right to a jury trial does not apply in suits against the United States because it "hardly can be maintained that under the common law in 1791 jury trial was a matter of right for persons asserting claims against the sovereign"). Parties will not bring forward arguments that have been rejected in this order, but are free to argue that either method, or some other equitable method of allocating basis, is appropriate.

**IT IS THEREFORE ORDERED:**

1.      Defendant's Motion for Summary Judgment (Doc. 64) is **denied**.

2.      Plaintiffs' Motion for Summary Judgment (Doc. 67) is **denied**.

/ / /

/ / /

/ / /

/ / /

/ / /

3.     The Court has determined that Plaintiffs have demonstrated that they may have had some basis in the mutual rights, and that the open transaction doctrine does not apply in this case. The basis in the life insurance policies "shall be equitably apportioned among the several parts." 26 C.F.R. § 1.61-6(a).

Dated this 9th day of July, 2012.

_A. Murray Snow_
G. Murray Snow
United States District Judge