**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Bennett and Jacquelynn Dorrance,<br><br>Plaintiffs,<br><br>v.<br><br>United States of America,<br><br>Defendant. | No. CV-09-1284-PHX-GMS<br><br>**FINDINGS OF FACT AND CONCLUSIONS OF LAW AND JUDGMENT** |

On December 18 and 19, 2012, this matter was tried to the Court without a jury. (Doc. 114, 115.) This Order constitutes the Court's findings of fact and conclusions of law under Federal Rule of Civil Procedure 52(a).[1]

## BACKGROUND

In 1996, Bennett and Jacquelynn Dorrance ("Plaintiffs") purchased several life insurance policies from mutual companies. Along with insurance benefits, those policies granted Plaintiffs mutual ownership rights in the companies ("mutual rights") for as long as they paid premiums. These mutual companies later demutualized and converted into stock-based companies. In 2000 and 2001, the mutual companies compensated Plaintiffs

---

[1] During trial, at the conclusion of Plaintiffs' case, Defendant moved for partial judgment pursuant to Federal Rule of Civil Procedure 52(c). Defendant argued that Plaintiffs failed to meet their burden of proof. Defendant contended that Plaintiffs had not provided an equitable method to apportion cost basis between their mutual rights and insurance benefits. Furthermore, Plaintiffs did not offer evidence that they had a realistic expectation of demutualization and that they paid an additional amount for mutual rights. *See Gladden v. Comm'r*, 262 F.3d 851, 854-55 (9th Cir. 2001). The Court denied Defendant's Motion.

for the loss of their mutual rights with shares of stock valued at $1,794,771. On June 23, 2003, Plaintiffs sold those shares for an aggregate amount of $2,248,806. Consistent with IRS policy that policyholders have no basis in stock received during demutualization of a life insurance company, Plaintiffs listed a zero cost basis when reporting their proceeds for the tax year ending on December 31, 2003 and paid taxes on the full amount. On October 15, 2007, Plaintiffs filed a claim for a refund, arguing that they did not owe tax on their proceeds. Because the IRS did not issue a final determination regarding the refund, Plaintiffs filed suit in this Court to affirm their claim on June 15, 2009.[2]

On July 9, 2012, this Court issued an Order ruling on the Parties' cross-motions for summary judgment. (Doc. 88.) Defendant argued that Plaintiffs paid premiums to acquire insurance benefits, not to obtain mutual rights under the policy. Accordingly, Plaintiffs had no basis in the stock that was provided in exchange for those mutual rights. However, this Court held that Plaintiffs had met their burden of showing they paid *something* for the mutual rights because they paid premiums for policies that included both policy rights and mutual rights.

Plaintiffs contended that the demutualization should be governed by the "open transaction doctrine" which is employed when the basis in property that is split cannot be allocated to the resulting assets because it is not clear how much each asset cost. *See Fisher v. United States*, 82 Fed. Cl. 780, 795 (Fed. Cl. 2008) (*aff'd without opinion by Fisher v. United States*, 333 Fed. App'x. 572 (2009)). For example, under this doctrine, proceeds from Plaintiffs' sale of stock would be considered return of capital from their premiums, and they would thereby owe no tax. This Court held that the doctrine did not apply because Plaintiffs' mutual rights were not "elements of value so speculative in

---

[2] Plaintiffs Bennett and Jacquelynn Dorrance originally sought a refund in the amount of $2,678,411.10 for the taxable years ending December 31, 2002, 2003, and 2004 on three unrelated and distinct bases. (Doc. 1 at 1-2.) They sought a refund of penalties and interest the IRS assessed against them for participation in an allegedly illegal tax shelter. On October 10, 2011, Plaintiffs abandoned that portion of their Complaint. (Doc. 64 at 2.) Plaintiffs also sought to recover an overpayment of taxes due to the miscalculation of their investment interest expense deduction. That issue was settled with Defendant. (*Id.*)

character as to prohibit any reasonably based projection of worth." *Campbell v. United States*, 661 F.2d 209, 215 (Ct. Cl. 1981).

The remaining issue for trial was to determine an equitable method to allocate the premiums paid by Plaintiffs before demutualization and apply that amount as a cost basis to calculate the taxable gain, if any, on their sale of stock.

## FINDINGS OF FACT

1. In 1995, Plaintiffs formed the Dorrance 1995 Legacy Trust (the "Trust") and retained a financial consulting firm to assemble a pool of survivor coverage for their heirs. Through that Trust, Plaintiffs purchased the life insurance policies at issue as part of an estate plan. They purchased policies with the Prudential Insurance Company of America ("Prudential"), Sun Life Assurance Company of Canada ("Sun Life"), Phoenix Home Life Mutual Insurance Company ("Phoenix"), Principal Life Insurance Company ("Principal"), and Metropolitan Life Insurance Company ("MetLife") (collectively, the "Companies"). At that time, all of the Companies were mutual insurance companies.

2. On April 28, 1996, Plaintiffs purchased the Principal policy with a face value of $10,000,000 and annual premiums of $124,450. On April 30, 1996, Plaintiffs purchased the Phoenix policy with a face value of $8,000,000 and annual premiums of $106,355. On June 1, 1996, Plaintiffs purchased the Prudential policy, which provides the bulk of their coverage, with a face value of $50,000,000 and fluctuating premiums. On June 10, 1996, Plaintiffs purchased the MetLife policy with a face value of $17,500,000 and annual premiums of $254,350. On August 20, 1996, Plaintiffs purchased the Sun Life policy with a face value of $2,275,000 and annual premiums of $33,259.

3. Mutual insurance companies issue no stock and have no shareholders. Instead, initial capital requirements come from premiums paid by policyholders. Policyholders are the owners of mutual companies which operate for their benefit and seek to offer reliable insurance at a low cost.

4. A typical purchaser of a life insurance policy from a mutual company understands that, by virtue of buying a policy, he or she becomes an owner of the

- 3 -

company. The possession of mutual rights was a typical selling point to potential policyholders.

5. A stock-based life insurance company is organized and operated for the purpose of making a profit for its shareholders. Policyholders may also be shareholders if they purchase stock, but otherwise policyholders have no equity interest in the company and no voting rights. If a stock-based insurance company has surplus, it is distributed to the shareholders, not the policyholders.

6. Mutual rights include the right to share in company profits, to vote, and to a preferred position in the event of liquidation. Each policyholder has one vote regardless of how many policies the policyholder owns and of the size of each policy. These rights arise by operation of state law and under corporate charters. *See*, *e.g.*, NY Ins. Law § 7312(a)(3) (mutual rights defined as "including, but not limited to, the rights to vote and to participate in any distribution of surplus whether or not incident to a liquidation of the mutual life insurer."). The Companies expressly defined their policyholders' mutual rights in their plans of demutualization.

7. Prior to demutualization, mutual rights were not separable from ownership of the life insurance policy. A policyholder could not sell or transfer mutual rights regardless of whether he retained the underlying policy to which they were inextricably tied.

8. Plaintiffs paid premiums to the Companies which secured life insurance and mutual rights. However, the Companies did not allocate premiums or assign an independent cost to the mutual rights. Some of the Companies stated that policyholders' mutual rights could not be valued prior to demutualization.

9. If an underlying policy was terminated, either because of missed payments or because the death benefit came due, the mutual rights would also be terminated. For Plaintiffs, no such divestiture occurred prior to the five demutualizations in this case.

10. The Companies demutualized into stock companies by exchanging the policyholders' mutual rights for shares of stock through processes that culminated in

2000 and 2001. They demutualized to raise additional capital through an initial public offering ("IPO") which occurred at the same time as the demutualization.

11. The demutualizations went through several levels of approval. First, the Companies' boards of directors investigated and voted to approve demutualization. This investigation involved the opinions of independent actuaries and investment banks regarding the fairness of the compensation to be given to policyholders. Second, state insurance commissioners approved the plans. Third, the plans were submitted to policyholders, who approved them by significant majority votes.

12. MetLife's board unanimously approved its Plan of Reorganization on September 28, 1999. Following approval by the New York state insurance commissioner, a public hearing, and an approval vote by policyholders, MetLife's IPO and demutualization took place on April 4, 2000.

13. On December 18, 2000, Phoenix's board of directors unanimously approved its Plan of Reorganization. Following approval by the New York state insurance commissioner, a public hearing, and an approval vote by policyholders, Phoenix's IPO and demutualization took place on June 19, 2001.

14. On March 31, 2001, Principal's board of directors unanimously approved its Plan of Conversion. Following approval by the Iowa state insurance commissioner, a public hearing, and an approval vote by Principal's policyholders, Principal's IPO and demutualization took place on October 22, 2001.

15. On December 15, 2000, Prudential's board of directors unanimously approved a Plan of Reorganization. Following approval by the New Jersey state insurance department, a public hearing, and an approval vote by policyholders, Prudential's IPO and demutualization took place on December 12, 2001.

16. On September 28, 1999, Sun Life's board unanimously approved its plan of demutualization. Following approval by the Canadian insurance superintendent and the Michigan state insurance commissioner, and an approval vote by Sun Life's policyholders, Sun Life's IPO and demutualization took place on March 23, 2000.

17. After the Companies demutualized, Plaintiffs retained their policies and continued to pay premiums but no longer had mutual rights. In exchange for relinquished mutual rights, the Companies provided Plaintiffs with stock compensation.

18. When determining how many shares of stock to give policyholders, the Companies calculated (1) a fixed component for the loss of voting rights, since each policyholder was entitled to one vote, and (2) a variable component for the loss of other rights, measured by the policyholder's past and projected future contributions to the company's surplus.[3] Of the variable component, 60% was an estimate of each policyholder's past contributions to surplus as of the calculation date while the remaining 40% was an estimate of future contributions.

19. Although the Companies used different methods to measure policyholders' contribution to surplus, all obtained independent actuarial opinions that the share allocation methods were sound and that the stock compensation was "fair and equitable." The Companies also obtained opinions from investment banks, concluding that the compensation was fair to the group as a whole.

20. The Companies informed policyholders that their mutual rights were being "exchanged" for stock. (Doc. 70-3 at 12; Doc. 71-1 at 11; Doc. 68-7 at 11; Doc. 69-1 at 20; Doc. 69-3 at 12.) In 2000 and 2001, Principal and Sun Life represented to the IRS that the fair market value of the stock policyholders would receive during demutualization approximately equaled the fair market value of mutual rights that policyholders surrendered. (Doc. 24 at 3); I.R.S. Priv. Ltr. Rul. 200020048 at 6 (Feb. 22, 2000) (representation (g)) (Sun Life Private Letter Ruling).

21. The aggregate IPO value of the shares that the Companies granted to Plaintiffs during demutualization was $1,794,771. At the time of the IPOs, Plaintiffs had paid $15,265,608 in premiums on the five life insurance policies.

22. Plaintiffs received 2,721 shares in MetLife's demutualization. The IPO

---

[3] "Surplus" is the book value or equity of the insurance company. It is equal to the company's assets reduced by its liabilities.

- 6 -

stock price on April 4, 2000 was $14.25 per share. The IPO value of the shares Plaintiffs received was $38,774. At the time of MetLife's IPO, Plaintiffs had paid $1,017,400 in premiums.

23. Plaintiffs received 1,601 shares in Phoenix's demutualization. The IPO stock price on June 19, 2001 was $17.50 per share. The IPO value of the shares Plaintiffs received was $28,018. At the time of Phoenix's IPO, Plaintiffs had paid $638,130 in premiums.

24. Plaintiffs received 5,039 shares in Principal's demutualization. The IPO stock price on October 22, 2001 was $18.50 per share. The IPO value of the shares Plaintiffs received was $93,222. At the time of Principal's IPO, Plaintiffs had paid $746,700 in premiums.

25. Plaintiffs received 58,455 shares in Prudential's demutualization. The IPO stock price on December 12, 2001 was $27.50 per share. The IPO value of the shares Plaintiffs received was $1,607,513. At the time of Prudential's IPO, Plaintiffs had paid $12,730,342 in premiums.

26. Plaintiffs received 3,209 shares in Sun Life's demutualization. The IPO stock price on March 23, 2000 was $8.49 per share. The IPO value of the shares Plaintiffs received was $27,244. At the time of Sun Life's IPO, Plaintiffs had paid $133,036 in premiums.

27. Plaintiffs sold all of their shares on June 23, 2003, for an aggregate value of $2,248,806. The MetLife stock sold with proceeds of $76,953. The Phoenix stock sold with proceeds of $15,289. The Principal stock sold with proceeds of $164,603. The Prudential stock sold with proceeds of $1,925,797. The Sun Life stock sold with proceeds of $66,164.

**CONCLUSIONS OF LAW**

1. This is an action for the refund of federal income taxes in the amount of $2,248,806 for the taxable year ending December 31, 2003. This Court has jurisdiction by reason of 28 U.S.C. § 1346(a)(1) and 26 U.S.C. § 7422.

2. Venue is proper in this District under 28 U.S.C. § 1391(e) because Plaintiffs reside in this District and because a substantial part of the events giving rise to this claim took place in this District.

3. Taxpayers are required to report "[g]ains derived from dealings in property" in their gross income under I.R.C. § 61(a)(3). In general, the amount of gain or loss recognized upon the sale of property is the difference between the adjusted basis of the property sold and the amount realized from the sale. I.R.C. § 1001(a), (c); Treas. Reg. §§ 1.61-6(a), 1.1001-1(a).

4. A taxpayer's basis in property is equal to the cost of that property to the taxpayer. I.R.C. § 1012. A taxpayer must prove what he actually paid for property to establish a basis in that property. *See Gladden*, 262 F.2d at 855. However, if "it is clear that the taxpayer is entitled to some deduction, but he cannot establish the full amount claimed, it is improper to deny the deduction in its entirety." *United States v. Marabelles*, 724 F.2d 1374, 1383 (9th Cir. 1984).

5. "[W]hen property is acquired in a lump-sum purchase but then divided and sold off in parts," Treas. Reg. § 1.61-6(a) requires that "the cost basis of the property should generally be allocated over the several parts." *Gladden*, 262 F.3d at 853. Thus, the default rule calls for the taxpayer to "equitably apportion[]" the basis of the property among its elements when those elements are sold. Treas. Reg. § 1.61-6(a).

6. Taxpayers must prove their bases in property by a preponderance of the evidence and substantiate the amount of the refund they seek. *See Coloman v. Comm'r*, 540 F.2d 427, 429 (9th Cir. 1976); *United States v. Janis*, 428 U.S. 433 (1976). The fact that basis may be difficult to establish does not relieve a taxpayer from his burden. *Coloman*, 540 F.2d at 430. Plaintiffs must prove that there is an equitable method of estimating the amount they paid for mutual rights at the time they purchased insurance policies and paid premiums.

7. Defendant contends that Plaintiffs did not pay an additional amount for mutual rights and did not have a realistic expectation of demutualization. Therefore,

- 8 -

Plaintiffs should not be allocated any basis from the premium payments. *See Gladden*, 262 F.3d at 855. The *Gladden* Court addressed a situation where taxpayers did not own the asset at issue at the time of a land purchase but rather, obtained unvested water rights contingent on the execution of a government irrigation project. *Id.* In contrast, Plaintiffs obtained *vested* mutual rights when they bought insurance policies. At the time of purchase, Plaintiffs had voting rights and the ability to participate in any distribution of the company's surplus, whether or not that distribution was triggered by a demutualization. Therefore, the *Gladden* "expectation test" is not applicable to these facts. The correct question is how to allocate cost between mutual rights and policy rights under Treas. Reg. § 1.61-6(a).

8.  Although Plaintiffs' mutual rights contributed to the insurance policies' value from the time the policies were purchased, the cost of the mutual rights could not be determined prior to demutualization. The mutual rights were not separable from the policy rights and could not be sold. Therefore, the cost associated with acquiring mutual rights cannot be established exclusively through Plaintiffs' payment of premiums.

9.  The first valuation of what Plaintiffs paid for mutual rights was the IPO price of the shares they received pursuant to demutualization. The Companies determined that the fair market value of the shares were equivalent to the value of the mutual rights. Furthermore, the shares were allocated in exchange for mutual rights in a fair and equitable manner, as determined by the Companies, actuaries, and state insurance commissioners.

10. The Companies allocated shares to Plaintiffs based on (1) the value of voting rights, (2) past contributions to surplus, and (3) projected future contributions to surplus. Effectively, Plaintiffs paid for shares of stock in the demutualized Companies by relinquishing voting rights and making contributions to surplus. However, projected future contributions to surplus are a portion of premiums which Plaintiffs had not actually paid before receiving shares and cannot be considered as a part of basis.

11. Therefore, Plaintiffs' basis is equal to the combination of the IPO value of

shares allocated to Plaintiffs for (1) the fixed component representing compensation for relinquished voting rights ("fixed shares") and (2) 60% of the variable component representing past contributions to surplus ("variable shares").

12. The following is the calculation, by insurer, of the IPO value of the fixed shares. For the MetLife policy, Plaintiffs were allocated 10 fixed shares amounting to an IPO value of $143. (Doc. 70-3 at 23.) For the Phoenix policy, Plaintiffs were allocated 18 fixed shares amounting to an IPO value of $315. (Doc. 75-6 at 2.) For the Principal policy, Plaintiffs were allocated 100 fixed shares amounting to an IPO value of $1,850. (Doc. 68-7 at 29.) For the Prudential policy, Plaintiffs were allocated 8 fixed shares amounting to an IPO value of $220. (Doc. 69-11 at 33.) For the Sun Life policy, Plaintiffs were allocated 75 fixed shares amounting to an IPO value of $637. (Doc. 69-3 at 31.) The aggregate IPO value of the fixed shares was $3,164.

13. The following are the calculations, by insurer, of the IPO value of the variable shares.[4] For the MetLife policy, Plaintiffs were allocated 2,711 variable shares amounting to a value of $38,632. For the Phoenix policy, Plaintiffs were allocated 1,583 variable shares amounting to a value of $27,703. For the Principal policy, Plaintiffs were allocated 4,939 variable shares amounting to a value of $91,372. For the Prudential policy, Plaintiffs were allocated 58,447 variable shares amounting to a value of $1,607,293. For the Sun Life policy, Plaintiffs were allocated 3,134 variable shares amounting to a value of $26,608. The aggregate IPO value of the variable shares is $1,791,606. Plaintiffs' past contributions to surplus is equal to 60% of the aggregate IPO value, amounting to $1,074,964.

14. Accordingly, Plaintiffs' basis is equal to the IPO value of the fixed shares ($3,164) combined with 60% of IPO value of the variable shares ($1,074,964). That amounts to a basis of $1,078,128 applicable to Plaintiffs' sales proceeds of $2,248,806.[5]

---

[4] The amounts of variable shares, by insurer, are calculated by deducting the amount of fixed shares from the aggregate amount of shares allocated to Plaintiffs.

[5] Plaintiffs offer a method to account for additional contributions made to surplus

- 10 -

After selling their shares in 2003, Plaintiffs paid tax on that basis at a 15% capital gains tax rate. Thus, they are entitled to a refund of $161,719.20.

15. Any conclusion of law deemed a finding of fact is so adopted.

### CONCLUSION

Plaintiffs paid for shares of stock in the demutualized Companies by contributing to the Companies' surplus and by relinquishing voting rights in exchange for the shares. Accordingly, they had a cost basis in the shares of $1,078,128. Plaintiffs are entitled to a refund of taxes in the amount of $161,719.20.

**IT IS THEREFORE ORDERED** that Plaintiffs' request for a refund of taxes is granted.

**IT IS FURTHER ORDERED** directing the Clerk of Court to terminate this action and enter judgment accordingly.

Dated this 19th day of March, 2013.

*/s/ A. Murray Snow*
G. Murray Snow
United States District Judge

---

between the calculation date for share allocation and the IPO date, as an element of basis in shares. (Doc. 119 at 5-6.) Plaintiffs provide this methodology for the first time in post-trial briefing. Their failure to provide this methodology at trial has waived it for purposes of calculating additional contributions to surplus as an element of basis. *See Air Separation, Inc. v. William H. Cauley Ins., Inc.*, 967 F.2d 583 (9th Cir. 1992); *Northwest Acceptance Corp. v. Lynnwood Equipment, Inc.*, 841 F.2d 918, 924 (9th Cir. 1988).

- 11 -